**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA

v.                                                    Case No. 8:18-cr-483-T-36JSS

DAJOR ATKINS
_____/

# O R D E R

This matter comes before the Court upon Defendant's Renewed Motion for Judgment of Acquittal (Doc. 256), Defendant's Motion for New Trial (Doc. 258), and the Government's responses thereto (Doc. 264; Doc. 273). In the Renewed Motion for Judgment of Acquittal, Defendant requests that the Court vacate his conviction on Count III, brandishing a firearm during and in furtherance of a crime of violence, and enter a judgment of acquittal because there was insufficient evidence before the jury that Defendant had advance knowledge that a firearm would be used in the commission of the substantive robbery offense. The Government disagrees, arguing that sufficient evidence existed such that a reasonable jury could have found that Defendant was aware of the firearm prior to the commission of the robbery.

In the Motion for New Trial, Defendant requests that the Court vacate his convictions and order a new trial because the Government impermissibly bolstered the credibility of its cooperating witness. The Government again disagrees, arguing that a new trial should not be granted because no impermissible bolstering occurred. The Court, having considered the motions and being fully advised in the premises, will deny both motions.

## I.      BACKGROUND

A federal grand jury returned a second superseding indictment charging Defendant Dajor Atkins with four counts stemming from a June 2, 2018 robbery of an AT&T store located in

Clearwater, Florida. Doc. 169. The second superseding indictment charged Defendant with (I) conspiring to interfere with commerce by robbery in violation of 18 U.S.C. § 1951; (II) interfering with commerce by robbery in violation of 18 U.S.C. § 1951(a); (III) brandishing a firearm during and in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and (IV) possessing a firearm despite being a convicted felon in violation of 18 U.S.C. § 922(g). *Id.* The indictment also sought various forfeitures in the event of conviction. *Id.* The case proceeded to trial on August 26, 2019.

The following evidence was presented at trial. Riley Harris ("Harris") committed three armed robberies of AT&T stores prior to June 2, 2018. Doc. 261 at 3:11-3:15. In at least two of those three robberies, Harris utilized the assistance of another person. In the first robbery, Harris had a woman named Cornika Wright serve as a lookout and getaway driver. Doc. 260 at 42:15-42:19, 48:12-48:21, 60:1-60:2. In the third robbery, Harris had a woman named Alonia Perkins serve as a getaway driver. *Id.* at 111:15-111:23, 113:4-113:10, 116:25-117:2.

In mid or late May 2018, Harris told Defendant about the third robbery he had committed, including how it happened and how much money he made. Doc. 261 at 25:10-25:25, 26:16-26:23. However, Harris did not mention to Defendant that he had used a gun in that robbery. *Id.* at 35:19-35:24.

Defendant told Harris of his interest in participating in a future robbery so that Defendant could make money as well. *Id.* at 26:2-26:10. Harris told Defendant that he would need Defendant to drive. *Id.* at 26:11-26:15. Harris also told Defendant that Harris needed to get some things before then—"a rental car, a new gun, stuff like that"—and that Harris would let Defendant know when he was ready. *Id.* at 27:6-28:8. Within a week or two, Harris obtained a rental car, a new gun, and

a mask. *Id.* at 26:16-26:23, 29:5-29:8, 30:7-30:19. Harris then told Defendant that he was ready. *Id.* at 30:15-30:23.

On Saturday, June 2, 2018, Harris picked Defendant up from his house. *Id.* at 33:6-33:16. Harris had brought with him a change of clothes, gloves, a mask, and a gun, which he had kept in one or more bags. *Id.* at 34:8-34:17, 35:16-35:18; 95:7-95:25. Defendant took over the driving and Harris moved to the back seat to change clothes and get ready. *Id.* at 33:11-34:15.

The men backed the vehicle into a parking space in front of an AT&T store. *Id.* at 38:11-38:20. From the car, Harris changed his clothes, put on gloves and a mask, and took the gun out of a bag. *Id.* at 39:11-39:21. Inside the car, Harris cocked the gun and it made an audible sound. *Id.* at 39:19-40:5.

Harris exited the car with a duffel bag. *Id.* at 40:6-41:2, 95:20-96:9. Harris kept the gun concealed while on the sidewalk, taking the gun out when he entered the store. *Id.* at 40:21-41:4, 96:2-96:10. Defendant kept a lookout while Harris was in the store and the two stayed in communication through cell phone. *Id.* at 44:14-44:25, 45:16-45:25. Harris told Defendant when he was ready to leave the store. *Id.* at 47:4-47:16. Before exiting the store, Harris put the gun in a bag. *Id.* at 96:21-96:25. Harris exited the store and climbed into the trunk of the car with his bags, including a bag that held the gun. *Id.* at 47:4-47:16, 50:18-50:25, 96:25-97:2.

The men had previously agreed to drive back to where Defendant lived following the robbery. *Id.* at 42:20-43:9. Defendant drove away from the store and onto a bridge. *Id.* at 47:15-47:21, 48:10-48:14. Harris and Defendant later pulled over, changing the license plate and taking stickers off to make the car less identifiable as the one that left the parking lot of the store. *Id.* at 61:6-61:23.

Sometime after Defendant and Harris were arrested, Harris entered a plea agreement. Doc. 260 at 5:16-6:15, 7:8-7:25. Harris then began cooperating with investigators, in particular, FBI special agent James Bucenell ("Bucenell"). Doc. 273-1 at 3:14-4:8, 62:25-63:13. Harris offered Bucenell information about the four armed robberies, including the names of his accomplices and from where he had purchased firearms. *Id.* at 63:14-63:17; Doc. 273-2 at 5:7-5:15, 6:12-6:25, 9:4-9:15.

At trial, Harris testified about all four of the armed robberies. Doc. 260; Doc. 261. After Harris testified, the Government elicited testimony from Bucenell about his investigation of the robberies. Bucenell discussed the information Harris had offered and how the investigative leads resulting from that information turned out. On several occasions, the Government asked Bucenell on direct examination whether his further investigation "corroborated" or "matched" the information Harris had offered or whether the "investigative leads pan[ned] out." Doc. 273-1 at 63:13-64:1, 66:5-67:23; Doc. 273-2 at 4:2-9:15. Defendant objected several times to the Government's line of questioning.

Defendant first objected on the basis of relevancy. Doc. 273-1 at 64:9. The Court called counsel to sidebar and asked how much longer the Government intended to question Bucenell about his investigation of Cornika Wright so that the Court could determine when to release the jury for the evening. *Id.* at 65:17-65:21. The Court overruled Defendant's objection and instructed the Government to finish the current testimony related to Cornika Wright so that the Court could then stop and send the jury home. *Id.* at 65:17-65:24. The following relevant exchanges then took place late that afternoon and the following day.

BY MR. GORDON [for the Government]:
Q Special Agent Bucenell, you can answer the question. Did you review the cell site records?
A Yes, I did.

Q Did they corroborate what Riley Harris told you?

A Yes.

Q Did you find other information that corroborated what he told you about Cornika Wright?

A Yes. Yes.

Q Did you investigate her employment history?

A Yes, I did.

Q Did her employment history match what Riley Harris told you?

A Yes, it did.

Q Was she employed at an AT&T store?

A She was actually employed at the Parrish store.

Q Same store that he robbed?

A Yes.

MS. HARDIN [counsel for Defendant]: Objection. Bolstering.

THE COURT: Well, I'm going to sustain the objection. I think it goes beyond our conversation at sidebar, so is there any further inquiry regarding this area?

BY MR. GORDON:

Q Did you do anything else or did you find anything else that corroborated what he said about Cornika Wright beyond what you described so far?

MS. HARDIN: Same objection.

MR. GORDON: Just trying to ask the question that Your Honor wanted me to ask.

THE COURT: Counsel, come back to sidebar.

(Whereupon a sidebar was had outside the hearing of the jury as follows:)

THE COURT: Mr. Gordon, you've asked five, eight, almost ten questions about whether he found information that corroborated Mr. Harris. I think you've made that point. Can we move on?

MR. GORDON: Yes, Your Honor.

THE COURT: Can we end? He's already said at least five or six different times that he corroborated it. I mean, I don't know that it's necessary to get into every detail of what he corroborated. He clearly has stated several times that it was corroborated. Okay.

MR. GORDON: Yes.

(Whereupon the proceedings were resumed in the presence and hearing of the jury as follows:)

THE COURT: All right. Members of the Jury, that concludes our testimony for today.

. . .

BY MR. GORDON:

Q Special Agent Bucenell, when we left off yesterday we were talking about any follow-up investigation you had done on Cornika Wright from the first robbery from December of 2017?

A Correct.

Q Turning to the second and third robberies, the ones that didn't involve this Defendant from Lutz and Hernando County in January and March of 2018?

A Yes.

Q Did you do follow-up investigation after interviewing Riley Harris on those two robberies?

A Yes, I did.

Q And what -- and did the follow-up investigation that you did corroborate things that Mr. Harris told you?

MS. HARDIN: Objection. Bolstering.

THE COURT: Response.

MR. GORDON: I'm not vouching for a witness, Your Honor. I'm asking this witness what he found when he investigated the things that my witness said.

THE COURT: All right. Rephrase your question.

BY MR. GORDON:

Q Did you have new investigative leads based on information that Riley Harris gave you?

A Yes.

Q Did those new investigative leads pan out?

A Yes, some of them did.

Q And can you explain which ones did?

A The gun that was used in the Lutz robbery was actually impounded by the sheriff's office subsequent to Mr. Riley's arrest on April 12th. Although I wasn't able to corroborate whether that was the exact gun, based upon a witness identification through sight, it was an extended magazine and it was a Glock, the one he had purchased in September of 2017 prior to the robbery of the Parrish store.

Q And how did you figure out exactly what gun he had purchased?

A Well, I had gone to I believe it was East Tampa Gun and Pawn. During the interview he told me that he purchased two guns near -- from pawn shops off of Hillsborough Avenue. I was able to serve subpoenas to the two in the vicinity like where he told me and one was purchased in September of 2017. The other was purchased April 17th, five days after the gun was seized from him from the Pasco County Sheriff's Office.

Q And do pawn shops keep records of not just that a firearm was sold but who actually bought it?

A It's an ATF form, yes. They are regulated if they are Federal firearms licensees.

Q Is that pawn shop a Federal firearms licensee?

A Yes.

Q And that form, does it require the purchaser to include their names?

A Yes, their name and some more biographical information, a driver's license number, date of birth, stuff like that.

Q And all -- and did all of that connect to Riley Harris?

A Yes.

Q Did you know about that pawn shop prior to interviewing Riley Harris?

A No. I didn't know about either pawn shop prior to that.

Q What other, if any, investigative leads panned out about the second and third robbery from information Mr. Harris gave you?

A The robbery that happened in Spring Hill there, Detective Courtman had run down the actual Ford F-150 that was rented by Mr. Harris and provided that

> information, the tag on the vehicle to Mr. Bill Grim who works for the Turnpike Authority. He was able to go through his records and produce documents and photographs of the vehicle traveling through the toll booths. In the tollbooth there was a photo of a female in the passenger seat whom I did not know who it was. Riley Harris was able to identify that person as Alonia Perkins.
> Q And in subsequent investigations, were you able to find anything that corroborated that identification of that person as Alonia Perkins?
> MS. HARDIN: Objection. May we approach?

Doc. 273-1 at 66:5-67:25; Doc. 273-2 at 3:18-8:22. At sidebar, Defendant objected on the basis of bolstering. The Court determined the Government's examination was proper, but noted that Defendant was objecting when the Government used the word "corroborating." Doc. 273-2 at 7:6-9:3. The Court asked the Government to rephrase the question. *Id.*

The Government continued questioning Bucenell following the discussion at sidebar, asking how information Harris offered "compare[d]" to what he found in his investigation. Doc. 273-2 at 9:4-11:7. Defendant did not object.

On the last day of trial, at the conclusion of the Government's presentation of evidence, Defendant made an oral motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. With respect to Count III, brandishing a firearm during and in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii), Defendant argued the Government produced insufficient evidence for a reasonable jury to find that Defendant had advance knowledge of the firearm, as required for conviction. Doc. 262 at 3:17-5:11. Defendant contended that the only evidence the Government offered about Defendant's advance knowledge was Harris' testimony that he chambered a round before leaving the vehicle. *Id.* at 4:12-4:25. Defendant argued (1) that Harris' testimony was contradicted by forensic evidence and (2) if Harris' testimony is believed, Defendant would not have known about the firearm until just before Harris exited the vehicle.

The Court denied Defendant's oral motion for judgment of acquittal, holding with respect to Count III as follows.

> The next one is Count 3, the 924(c), using or carrying or possessing a firearm in furtherance of a violent crime or drug trafficking crime, and this one did give the Court pause to consider as it pertains to the requirement in the instruction of using or carrying and possessing a firearm, aiding and abetting. This instruction 035.7 of the advanced knowledge in conjunction with the *Rosemond* case, which the Court has reviewed . . . and in considering the facts of this case and the instructions from the U.S. Court in *Rosemond*, the Supreme Court has indicated that the Section 924(c) Defendant's knowledge of a firearm must be advance knowledge or otherwise said knowledge that enables him to make the relevant legal and indeed moral choice. When an accomplice knows beforehand of a confederate's desire to carry a gun, he can attempt to alter that plan, or if unsuccessful, withdraw from the enterprise. It is deciding instead to go ahead with his role in the venture that shows his intent to aid an armed offense.
>
> In this case, the testimony is such that when they arrived—and the role that's been attributed to [Defendant] by virtue of Riley Harris is that of the getaway driver, the driver of the vehicle that was used to accomplish this robbery on June 2nd. The evidence is such that Mr. Harris testified or there's evidence that he actually pulled the firearm and took actions with the firearm that the jury could determine was audible such that [Defendant] was aware of the firearm in advance of Mr. Harris going into the store. At that point, and, again, I'm considering the evidence in the light most favorable to the Government, [Defendant] indeed had an opportunity to withdraw from the plan or to leave the plan. And in the *Rosemond* case, it is stated that when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts with assistance.
>
> In this case, the evidence again in the light most favorable to the Government is that [Defendant's] acts of assistance consisted of driving the vehicle, and so he had not completed those acts of assistance. He had driven there but had not yet driven away. And then *Rosemond* goes on to say, "or even if not, he may at that late point have no realistic opportunity to quit the crime." In this case, the evidence is such that the jury could believe or consider that [Defendant] had a realistic opportunity to quit the crime by driving away once Mr. Harris got out of the vehicle and entered the AT&T store that he did not do, and as a result the Court is going to deny the Defendant's motion for judgment of acquittal as to Count Three. Having reviewed the *Rosemond* case and being familiar with the evidence in this case, the evidence is sufficient for the jury to come back with a conviction on Count Three.

*Id.* at 15:4-17:12 (citing *Rosemond v. U.S.*, 572 U.S. 65 (2014).

The trial proceeded with Defendant offering a stipulation into evidence. Doc. 230 at p. 2. Upon resting, Defendant renewed his oral motion for judgment of acquittal. *Id.* The Court denied the motion, standing on its previous ruling.

Both sides presented closing argument. Doc. 230 at p. 2. In its closing argument, the Government stated that Harris was "very truthful" and had "told the truth" while testifying. Doc. 262 at 36:16, 37:20-37:21.

The Court instructed the jury prior to retiring for deliberations. Doc. 230 at p. 2; Doc. 235. One such instruction informed the jury of the need to decide for themselves whether they believed what each witness had to say and how important the testimony was. Doc. 235 at p. 5.

The jurors began deliberations on August 30, 2019. *Id.* Later the same day, the jury returned a verdict of guilty as to all counts of the second superseding indictment. Doc. 236. Defendant filed the instant Renewed Motion for Judgment of Acquittal and Motion for New Trial on October 11, 2019.[1]

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides the framework for judgment of acquittal based on lack of sufficient evidence. Under Rule 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." After a jury verdict, under Rule 29(c), a defendant "may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."

---

[1] Defendant's motions were timely filed, as the Court had previously granted extensions of time upon request. Doc. 252; Doc. 253; Doc. 254.

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Eleventh Circuit has described this as a "broad standard." *U.S. v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994). Additionally, "[t]he decision to grant or deny the new trial motion is within [the] sound discretion of the trial court and will not be overturned on appeal unless the ruling is so clearly erroneous as to constitute an abuse of discretion." *Id.* (quoting *U.S. v. Wilson*, 894 F.2d 1245, 1252 (11th Cir. 1990)).

## III. DISCUSSION

### A. Renewed Motion for Judgment of Acquittal

Defendant's oral motions for judgment of acquittal, made at two points during the course of trial, were denied by the Court. Both motions were based on Defendant's argument that the Government produced insufficient evidence for a reasonable jury to find that Defendant had advance knowledge of the firearm used in the commission of the robbery as required for conviction of Count III. Doc. 262 at 3:17-5:11. The Court disagreed, finding the Government had presented evidence at trial that Harris had taken actions with the firearm prior to entering the store on June 2, 2018 sufficient for a jury to conclude that Defendant was aware of the firearm in advance of Harris entering the store and in advance of Defendant completing his acts of assistance (driving the getaway car after the robbery). *Id.* at 15:4-17:12.

Indeed, additional review of the evidence presented at trial leads the Court to conclude, again, that the jury could have reasonably determined that Defendant was aware of the firearm in advance of Harris entering the store and in advance of Defendant completing his acts of assistance. Two parts of Harris' testimony support such a determination. First, Harris testified that before leaving the car to enter the store, he cocked the firearm such that it made an audible sound. Doc.

261 at 39:19-40:5. Second, the Government elicited testimony from Harris that he actually told Defendant about his plan to obtain a firearm. *Id.* at 27:6-28:8 (Harris testimony stating he told Defendant that he would need to get some things before their robbery—"a rental car, a new gun, stuff like that"—and that Harris would let Defendant know when he was ready). The evidence at trial was sufficient for a reasonable jury to conclude Defendant had advance knowledge of the firearm.

Defendant's Renewed Motion for Judgment of Acquittal offers no new arguments. Instead, Defendant simply rehashes his previous arguments, only this time with the "benefit of selected trial transcripts." Doc. 256 at p. 1. But, as discussed above, review of the transcripts indicates that the Court's previous understanding of the evidence was correct. Because Defendant offers no basis for the Court to reconsider its previous ruling, the Court will deny the Renewed Motion for Judgment of Acquittal. *U.S. v. Mulherin*, 529 F. Supp. 916, 923 (S.D. Ga. 1981), *aff'd*, 710 F.2d 731 (11th Cir. 1983).

### B. Motion for New Trial

Defendant seeks a new trial "in the interest of justice" on the basis that the Government impermissibly bolstered Harris' testimony. Defendant alleges Harris was a key Government witness—the only witness who would testify to Defendant's knowledge of the firearm and robbery plan. Doc. 258 at p. 3. Defendant contends that, to overcome untruthful statements Harris made during his testimony, the Government impermissibly bolstered Harris' testimony in two ways. First, Defendant contends the Government impermissibly bolstered Harris' testimony when it elicited Bucenell's testimony about his investigation of information Harris provided. Second, Defendant argues the Government impermissibly bolstered Harris' testimony by stating in closing argument that Harris had been truthful.

1. Bucenell's Testimony was Proper

Defendant first argues that the Government impermissibly bolstered Harris' testimony when it elicited testimony from Bucenell about his investigation of information Harris provided, including whether the provided information could be confirmed. According to Defendant, the clear purpose of this testimony was to persuade the jury that Harris' testimony had been truthful. Defendant argues Bucenell's testimony about his investigation is all the more problematic because the evidence Bucenell gathered in the course of his investigation was not in evidence or before the jury.

The Government argues that Bucenell never commented on Harris' trial testimony, nor vouched for Harris' truthfulness. Rather, the Government asserts, Bucenell testified purely as a fact witness. According to the Government, Bucenell's testimony about his discussions with Harris and the investigative steps he took as a result of interviewing Harris were entirely permissible.

The Eleventh Circuit has explained that it is impermissible for a witness to testify about the credibility of another witness. *U.S. v. Aplesa*, 690 Fed. Appx. 630, 636 (11th Cir. 2017) (citing *U.S. v. Schmitz*, 634 F.3d 1247, 1268-69 (11th Cir. 2011); *U.S. v. Henderson*, 409 F.3d 1293, 1299 (11th Cir. 2005)). "Witness credibility is the sole province of the jury. Therefore, a witness is not permitted to invade the jury's province by testifying 'that another witness was truthful or not on a specific occasion.'" *Id.* (citation omitted) (quoting *Schmitz*, 634 F.3d at 1268). Accordingly, expert testimony that boosts the credibility of a main witness by opining on the truthfulness of that witness or opining generally on the truthfulness of like witnesses is impermissible. *See Snowden v. Singletary*, 135 F.3d 732, 739 (11th Cir. 1998). It is also impermissible for the prosecution to ask witnesses at trial about whether other witnesses are telling the truth or not. *Schmitz*, 634 F.3d at 1268 ("[W]ere-they-lying questions invade the province of the jury, as credibility determinations

are to be made by the jury, not the testifying witness."). Prosecutors are also barred from implying the existence of additional evidence not before the jury because doing so may impermissibly "thr[ow] the weight of [the prosecutor's] office behind the witness' testimony and implicitly vouch[] for the witness by indicating that information not before the jury supported [that witness'] credibility." *U.S. v. Eyster*, 948 F.2d 1196, 1207 (11th Cir. 1991).

Defendant cites to *Snowden, Schmitz, Eyster, and Henderson* in support of its Motion for New Trial. But, as the Government points out, all four of those cases are distinguishable from the case here. Bucenell's testimony about Harris was limited to the facts of his investigation of the robberies. Unlike in *Snowden*, Bucenell was not asked to comment on, and did not comment on, whether he believed Harris was telling the truth about this case or whether cooperating witnesses like Harris are generally truthful. *Compare Schmitz*, 634 F.3d at 1268 (prosecutor asked testifying defendant whether other witnesses in the case were lying); *Snowden*, 135 F.3d at 737-38 (expert stated that 99.5% of children tell the truth about abuse); *Aplesa*, 690 Fed. Appx. at 636-37 (officer testified that cooperating witnesses often initially lie to law enforcement for various reasons).

Also, despite Defendant's contentions to the contrary, the Government did not introduce extrinsic evidence to the jury. In *Eyster*, the prosecution improperly vouched for a witness, "thr[owing] the weight of [the prosecution's] office behind the witness' testimony," by suggesting to the jury that a typographical error, of which there was no evidence, accounted for an inconsistency in the witness' testimony. 948 F.2d at 1204, 1207. The suggestion that a typographical error existed was the prosecution's own, and was presented to the witness on redirect in the form of hypothetical. *Id.* at 1203.

Here, the "extrinsic" evidence Defendant objects to is Bucenell's testimony about the three robberies that occurred before June 2, 2018 involving Harris but not Defendant. According to Defendant, that evidence relates to "other cases" or "other crimes." Doc. 258 at pp. 2-3.

Bucenell's testimony about the three earlier robberies was not extrinsic and was not elicited by the Government in a manner that "threw the weight" of the U.S. Attorney's Office behind it. *Eyster*, 948 F.2d at 1207 ("Evidence comes from the witness stand, not from an attorney's mouth."). The Government elicited Bucenell's testimony about the three earlier robberies not by making any sort of suggestions, but by simply asking Bucenell about how he became involved in this case. Doc. 273-1 at 5:10-5:21. Moreover, Bucenell's testimony about the three earlier robberies was not the first time the jury heard about them; evidence about those robberies had been brought out by the Government previously through Harris' testimony.

In its Motion for New Trial, Defendant cites to a statement from the Eleventh Circuit providing that witness testimony "might be improper" if the Government attempts a "line of questioning as an indirect way of bolstering" another's credibility. Doc. 258 at p. 2 (citing *Henderson*, 409 F.3d at 1299). But this statement, which was made in dicta, cannot by itself support Defendant's position. In making the statement, the Eleventh Circuit noted that the issue— indirect bolstering—was not before the Court at that time. And since making the statement, the Eleventh Circuit has barely elaborated further on what "might be improper." *See id.*; *Aplesa*, 690 Fed. Appx. at 636. Stated differently, the law in the Eleventh Circuit does not support a finding that the Government bolstered Harris' testimony by asking a law enforcement officer involved in the same case factual questions about his investigation.

Although the Eleventh Circuit has not precisely discussed the issue, at least one circuit court has previously decided that a prosecutor may properly ask an investigator at trial whether he

or she was able to corroborate a cooperating witness' information, so long as the prosecutor elicits additional evidence about how such corroboration occurred. *U.S. v. Martinez*, 253 F.3d 251, 254 (6th Cir. 2001); *U.S. v. Cruz*, 270 Fed. Appx. 393, 398 (6th Cir. 2008) ("Instead of asking whether corroboration occurred, without more, the prosecutor focused on how the investigation unfolded and what kinds of techniques were used to collect evidence in the case."). In this case, whenever Bucenell confirmed that Harris' leads were corroborated by additional investigation, the Government followed up with questions eliciting further details about how the investigation was conducted. *E.g.*, doc. 273-2 at 4:19-6:4.

2. The Government's Closing Argument was Proper

Defendant also argues that the Government impermissibly bolstered Harris' testimony when it argued to the jury in closing that Harris had been truthful. Doc. 258 at p. 3. But the cases Defendant cites, discussed above, do not support his position. In *Schmitz*, "[t]he problem with the prosecutor's comments . . . is that they were a clear continuation of the improper questions posed previously during" a witness' testimony. 634 F.3d at 1270. But here, as discussed *supra*, the Government's questions of Bucenell were not improper. Therefore, any reference to Bucenell's testimony during the Government's closing was not a "clear continuation of the improper questions."

To the extent Defendant argues generally that the Government should be prohibited from commenting on a witness' credibility, such argument is without merit. As the Eleventh Circuit has explained, "[t]he prohibition against vouching does not forbid prosecutors from arguing credibility, which may be central to the case; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." *U.S. v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991). "[R]emarks . . . designed to refer the jury to evidence in the case

. . . favorable to the government" that does "not amount to an explicit, personal guarantee of credibility, such as assuring the jury that the prosecution would not have brought the case unless the defendant was actually guilty," is permissible. *Id. Accord U.S. v. Eley*, 723 F.2d 1522, 1526 (11th Cir. 1984) ("While a prosecutor may not vouch for the credibility of witnesses based on facts personally known to the prosecutor but not introduced at trial, 'that does not mean the prosecutor cannot argue that the fair inference from the facts presented is that a witness had no reason to lie.'" (citations omitted)).

The Government's comments in closing about Harris' truthfulness were based on the evidence presented to the jury at trial. *See* doc. 262 at 35:13-41:4. In its closing, the Government made no guarantees of credibility and did not introduce facts not in evidence.

3. A New Trial is Not Warranted

Neither the Government's questions about Bucenell's investigation nor the Government's closing argument discussing Harris' truthfulness constitute improper bolstering in this case. However, even if the Court had reached the opposite conclusion, it would still find that this case differs from those where bolstering was a basis to overturn a conviction and grant a new trial. In *Snowden*, the Eleventh Circuit was especially concerned about the expert witness' statements boosting the credibility of the main witness against the defendant because, other than the main witness' statements, there was a lack of evidence of guilt. 135 F.3d at 739. That is not the case here. Here, additional evidence presented to the jury, including cell phone communications, GPS data, observation of Defendant's exit from the getaway car, and Defendant's statements to law enforcement support Defendant's conviction. Moreover, the Court provided the jury with specific instructions about witness credibility, informing the jury that determinations about who to believe or not believe and determinations about the importance of the testimony was its decision. Doc. 235

at p. 5. The record does not support Defendant's argument that the Government improperly bolstered Harris' testimony or that such bolstering warrants a new trial.

Accordingly, it is hereby **ORDERED:**

1.      Defendant's Renewed Motion for Judgment of Acquittal (Doc. 256) is **DENIED.**

2.      Defendant's Motion for New Trial (Doc. 258) is **DENIED.**

**DONE AND ORDERED** in Tampa, Florida on December 11, 2019.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any